# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litigation | Master Dkt. No. 20-1076-CFC |
| This Document Relates To:<br>All End-Payor Class Actions |  |

## DECLARATION OF BENJAMIN M. GREENBLUM IN SUPPORT OF DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO EXCLUDE THE MANUFACTURING AND COMMERCIAL LAUNCH OPINIONS OF JANET K. DeLEON (*DAUBERT* MOTION NO. 5)

I, Benjamin M. Greenblum, declare and state as follows:

1.      I am a partner at the law firm of Williams & Connolly LLP.  I represent AstraZeneca Pharmaceuticals LP and AstraZeneca UK Ltd. in the above-captioned matter.  I am admitted *pro hac vice* in this Court.  I have personal knowledge of the facts set forth herein, and if called as a witness, could and would testify to them.

2.      Exhibit 4 is a true and correct copy of excerpts of the transcript of the March 1, 2024 deposition of Janet K. DeLeon.

Dated: October 7, 2024

By: */s/ Benjamin M. Greenblum*
Benjamin M. Greenblum
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW
Washington, D.C. 20024
(202) 434-5919
bgreenblum@wc.com

2

# EXHIBIT 4

Page 1

1                 IN THE UNITES STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE
2

3

IN RE:  SEROQUEL XR              )
4    (Extended Release              ) Master Docket No.
     Quetiapine Fumarate)           ) 20-1076-CFC
5    Antitrust Litigation           )

6

7

8           VIDEOTAPED DEPOSITION OF JANET K. DeLEON,
9        produced, sworn and examined on March 1, 2024,
10       between the hours of 9:00 o'clock in the morning
11       and 5:00 o'clock in the afternoon of that day,
12       taken at the law offices of Sanders Warren &
13       Russell, LLP, 11225 College Boulevard, Suite
14       450, Overland Park, Kansas, before Stacy L.
15       Decker, a Certified Court Reporter (MO),
16       Certified Shorthand Reporter (KS) in a certain
17       cause now pending before the United States
18       District Court for the District of Delaware, IN
19       RE: Seroquel XR (Extended Release Quetiapine
20       Fumarate) Antitrust Litigation; taken on behalf
21       of the Defendants.

22

23

24              GOLKOW LITIGATION SERVICES
             877.370.3377 ph | 917.591.5672 fax
25                  Deps@golkow.com

Page 9

1    applications as ANDAs today?

2                    A.    Yes, that would be fine.

3                    Q.    Ms. DeLeon, you are not, however,

4    an expert in the physical properties of

5    hydroxypropyl methyl cellulose, correct?

6                    A.    I am not, no.

7                    Q.    You are also not an expert in the

8    physical properties of methyl cellulose,

9    correct?

10                   A.    Correct.

11                   Q.    You are not an expert in the

12   gelation properties of hydrogenated vegetable

13   oil, correct?

14                   A.    I am not, no.

15                   Q.    And you are not an expert in

16   selecting which excipients to include in a

17   pharmaceutical formulation, correct?

18                   A.    Correct.  That's not part of my

19   assignment today.

20                   Q.    That's what I figured and I just

21   want to make sure I understand the full scope of

22   your assignment.

23                         You're also not an expert in the

24   design of pharmaceutical formulations, correct?

25                   A.    I have developed many formulations

Page 10

1    and gained approval for those products over the

2    years, but my true expertise is in regulatory.

3            Q.    Ms. DeLeon, you are not an expert

4    in the design of the milling process that

5    creates the particles of an active

6    pharmaceutical ingredient, correct?

7            A.    No, I'm not an expert in that.

8            Q.    And you are not an expert in

9    troubleshooting the curing processes for an

10   extended release tablet, correct?

11           A.    Correct.

12           Q.    So you are not an expert in the

13   manufacture of the pharmaceutical formulation as

14   opposed to the regulatory approval of the

15   pharmaceutical formulation, correct?

16           A.    I would not say that I'm an expert

17   in that.  However, I've sat on many

18   cross-functional teams for over 36 years, and so

19   I'm very familiar with it.  Of course, I'm not a

20   pharmacist and never went through the formal

21   training that pharmacists do in order to become

22   a formulator.

23           Q.    Ms. DeLeon, you are not an expert

24   in providing comprehensive oversight for a

25   multiple line pharmaceutical manufacturing

Page 11

1    facility, correct?

2                    A.    I have never been the management

3    of one of those facilities, no.  But, again,

4    I've worked on many cross-functional teams that

5    employ exactly that.  So I'm very familiar with

6    it.

7                    Q.    Ms. DeLeon, are you an expert in

8    the negotiation of raw materials supply

9    contracts?

10                   A.    I'm not a purchaser is what we

11   call it.  The purchasing department does that.

12   But, again, I'm very familiar with the process.

13   I've been on multiple cross-functional teams

14   that employ that.  I myself have -- when I was

15   at Cypress Pharmaceutical, I participated in

16   purchasing those excipients and raw materials in

17   general as well as the components that go into

18   drug products.  So I'm very familiar with it,

19   but it's -- that -- that is mainly my expertise.

20                   Q.    It was not your day job; it was

21   something your colleagues did that you heard

22   about; is that fair?

23                   A.    Exactly, yes.  I would participate

24   on a team and we would discuss it regularly.

25                   (Exhibit 360 was marked.)

Page 12

1                  Q.   (By Mr. Fletcher)  I'm now marking

2        as Exhibit 360 a document.  Ms. DeLeon, what is

3        Exhibit 360?

4                  A.   It's my resume.

5                  Q.   Do you recognize it?

6                  A.   I do.

7                  Q.   Are there any changes to this

8        resume since it was submitted as an exhibit to

9        your opening expert report?

10                 A.   No.  No changes, no.

11                 Q.   On the first page of the resume,

12       you refer to your role as the chief executive

13       officer of Jandel Pharmaceuticals.  Do you see

14       that?

15                 A.   I do.

16                 Q.   Has Jandel Pharmaceuticals ever

17       marketed a product?

18                 A.   It has not.

19                 Q.   Has Jandel Pharmaceuticals ever

20       sought regulatory approval for a product?

21                 A.   No, it has not.  Jandel is a

22       start-up company that we have looked into

23       several different products to acquire or to

24       develop and haven't quite gotten to the point

25       where we've actually gotten a product on hand,

Page 13

1    so it still remains a start-up company.

2                Q.    A start-up where you are looking

3    to in-license a drug to develop; is that

4    correct?

5                A.    Possibly.  Currently we're looking

6    at ACell therapy, that is with a university, and

7    we're -- we've got terms in place, but we're

8    looking for investors.

9                Q.    Is the name Jandel Pharmaceuticals

10    just a truncation of Janet DeLeon?

11                A.    It is, yes.

12                Q.    How many employees does Jandel

13    Pharmaceuticals have?

14                A.    Two at this point.

15                Q.    And who are the employees?

16                A.    Myself and Rob Lewis.

17                Q.    And what is Rob Lewis' role?

18                A.    He is the co-founder.  He is an

19    expert at developing products and companies.  He

20    is very familiar with the financial end of the

21    business.  He was my boss when I was at Cypress

22    Pharmaceutical.  So we've worked together many

23    years.  Seven years at Cypress, as well as the

24    past ten years he and I have both run our

25    consulting companies and have interacted on

Page 14

1     multiple products.  We're very familiar with

2     each other.

3              Q.   Did Jandel Pharmaceuticals have

4     any revenue in 2023?

5              A.   It did not, no.

6              Q.   Has Jandel Pharmaceuticals ever

7     had any revenue?

8              A.   No.  We're actually at a negative

9     right now.

10              Q.   Staying on the first page of your

11     resume, Exhibit 360, in the bullets under the

12     highlights you indicate that you have been

13     responsible for approval of 12 NDAs and ANDAs in

14     six and a half years.  Do you see that?

15              A.   I do.

16              Q.   How many of those 12 were ANDAs to

17     the best of your memory?

18              A.   I believe it was nine of them.

19              Q.   And so three were NDAs to the best

20     of your memory?

21              A.   Yes.

22              Q.   The distinction between an NDA and

23     an ANDA is an NDA is a new drug application,

24     whereas, the ANDA is the abbreviated new drug

25     application, correct?

Page 34

```
 1              Q.   In your answer there you're
 2     referring to the active pharmaceutical
 3     ingredient; is that correct?
 4              A.   It is, yes, otherwise called API
 5     or drug substance.
 6              Q.   Hetero did not make the actual
 7     tablets; it provided the API to Accord for
 8     Accord to make into tablets; is that fair?
 9              A.   That is fair, yes.
10              Q.   So when you say Hetero could have
11     supplied the XR product, too, you mean Hetero
12     could have provided the quetiapine fumarate for
13     the XR product?
14              A.   Yes.  Thank you for that
15     correction, yes.
16              Q.   You also -- have you analyzed the
17     Accord manufacturing process for the extended
18     release tablets?
19              A.   Not in particular, no.  But I am
20     familiar with other XR products.
21              Q.   From your prior work experience?
22              A.   Exactly, yes.
23              Q.   Have you studied the manufacturing
24     process for any XR product specific to this
25     case?
```

Page 35

1              A.    Not the specific procedure, no.
2       No.
3              Q.    You mentioned that both the IR and
4       XR tablets are extremely similar.  Did I get
5       that correct?
6              A.    I did, uh-huh.
7              Q.    They both use the exact same
8       active pharmaceutical ingredient; is that right?
9              A.    That's right.
10             Q.    And in the case of Accord, the
11      active pharmaceutical ingredient for both the
12      Seroquel IR tablets and Seroquel XR tablets even
13      came from the same supplier; is that correct?
14             A.    That's correct as I understand it,
15      yes.
16             (Exhibit 361 was marked.)
17             Q.    (By Mr. Fletcher)  Ms. DeLeon,
18      I'll hand you what I've marked as Exhibit 361.
19             A.    Okay.
20             Q.    Ms. DeLeon, what is Exhibit 361?
21             A.    It's a list of documents that I
22      relied on for my report.
23             Q.    And that is, in fact, the title of
24      the document is "List of Documents Relied Upon";
25      is that right?

Page 42

1          Q.   But you were not asked to,

2     correct?

3          A.   Correct.

4          Q.   Ms. DeLeon, how did you go about

5     preparing your report, Exhibit 359?

6          MS. HASS:   Objection.  Ms. DeLeon, I

7     just want to caution you to not reveal any

8     attorney communications that you didn't rely on

9     like your assignment and anything about the

10     drafting process, which is privileged and

11     confidential.

12          THE DEPONENT:   Okay.

13          A.   So I was provided an assignment,

14     which I stated earlier was the impediments to

15     regulatory approval or impediments to launching

16     the XR generic product for Accord.  And so I

17     requested documents that would support or negate

18     that.  Either way, I analyzed anything that was

19     available and put together this report based on

20     the findings that I saw in the documentation.

21          Q.   (By Mr. Fletcher)  Ms. DeLeon, do

22     you have an estimate for how many hours you

23     spent preparing this report?

24          A.   I do not, no.  I'm sorry.

25          Q.   Did you review the report for

Page 43

```
 1      accuracy before you signed it?
 2                  A.   Of course.
 3                  Q.   Did you proofread the report?
 4                  A.   I definitely did, which I'm glad
 5      you brought that up.  I did find one error that
 6      I'd like to bring up.
 7                  Q.   Sure.
 8                  A.   It's actually on Paragraph 39.
 9                  Q.   Okay.
10                  A.   I apologize that I didn't bring
11      this up earlier.
12                  Q.   What would you like to correct in
13      Paragraph 39?
14                  A.   Let me make sure that it is 39 to
15      begin with.  It would be on the third line.  And
16      it says, "indicating that an ANDA holder does
17      seek approval of its generic product."  And it
18      should be "does not."  Okay.  I missed the word
19      "not" in that.  Sorry.
20                  Q.   That's okay.  I think we
21      understood what you were trying to say.  But
22      I've made the note for myself, Paragraph 39,
23      third line, ANDA holder does not seek approval.
24                  A.   For Paragraph 3, yes.
25                  Q.   Okay.  And you noticed this as
```

Page 44

1    part of your preparation for today's deposition?

2              A.   I did, yes.

3              Q.   So you've reviewed this report for

4    accuracy when you signed it and again as part of

5    your preparation for this deposition, correct?

6              A.   Correct, yes.

7              Q.   At least twice then?

8              A.   At least, yes.

9              Q.   Or were there more than two

10   reviews for accuracy?

11             A.   Yes.  Yes.

12             Q.   Can you describe your process for

13   making sure that the report accurately reflects

14   your views, like how many times?

15             A.   How many times I reviewed again

16   or --

17             Q.   Or how did you make sure that it

18   reflected your views accurately?

19             A.   Well, I would -- I read through

20   the report.  I checked all of the references in

21   there.  I also relied on my historical knowledge

22   over 36 years, experiences that I've had in the

23   industry, working for small, medium, and large

24   companies.  I put my wealth of experience into

25   it.  But I also looked at the documentation that

Page 45

1    was provided.  I also looked at some other

2    documents that were not referenced in the report

3    just to make sure I didn't miss something.

4            Q.    Like the guidance, is that what

5    you're referring to?

6            A.    Which guidance?

7            Q.    Sorry.  When you say you looked at

8    other documents not referenced in the report,

9    are you referring to those FDA guidance, ICH

10   concepts that are just --

11           A.    Yes, exactly.

12           Q.    Anything else?

13           A.    No.  It would be those, those

14   guidances.

15           Q.    So when you cited a document or a

16   reference, you checked to make sure it said what

17   you were characterizing it as in your report; is

18   that fair?

19           A.    Yes, I did.

20           Q.    So I'd like to go back to the very

21   first page of the report to just understand

22   something.

23           A.    Okay.

24           Q.    Very second -- second paragraph,

25   heading two.  Ms. DeLeon, what does heading two

Page 46

1    refer to?

2              A.   It says jurisdiction and venue.

3              Q.   What is jurisdiction?

4              A.   The parameters which I am working

5    within.

6              Q.   Okay.  And what is venue?

7              A.   Again, I believe it's a legal

8    term, but it's -- it's the part that I'm working

9    within.

10             Q.   So what follows in paragraphs 2

11   through 17 is your professional background,

12   right?

13             A.   Yes, it is.  Uh-huh.

14             Q.   And you described your

15   professional background as your jurisdiction and

16   venue; is that right?

17             A.   That's what it is, yes.

18             Q.   That's not a typo, right?

19             MS. HASS:  Objection, asked and

20   answered.

21             A.   Yeah, it -- this is -- this is

22   what I've written.

23             Q.   (By Mr. Fletcher)  Okay.  Just we

24   were correcting typos before.  We corrected

25   Paragraph 39.  We don't need to correct heading

Page 47

1    two, though, correct?

2              A.    I don't believe so.  I'm not a

3    lawyer.  Legal terms sometimes are misused by

4    me, I'll admit, but I believe that these are

5    correct.

6              Q.    So only one typo and it's in

7    Paragraph 39?

8              A.    Yes.

9              Q.    Okay.  Paragraph 62, if you could

10   please go to that paragraph again.

11             A.    62?

12             Q.    Yes.  Paragraph 62, you refer to

13   NDA number 022047.  Do you see that?

14             A.    I do.

15             Q.    And what was NDA 022047?

16             A.    It was the branded version from

17   AstraZeneca for the Seroquel XR.

18             Q.    And pursuant to NDA number 022047,

19   FDA gave approval to AstraZeneca to sell the 50,

20   150, 200, 300, and 400 milligram strengths,

21   correct?

22             A.    Correct.

23             Q.    And in Paragraph 63 you describe

24   Accord's ANDA, correct?

25             A.    Yes, I do.

Page 68

1           Q.   How is a capsule different from a
2    tablet?
3           MS. HASS:   Objection.   Outside the
4    scope of her report.
5           A.   It's not something I was asked to
6    opine on.
7           Q.   (By Mr. Fletcher)   In your
8    experience is a capsule different from a tablet?
9           MS. HASS:   Same objection.
10           A.   So I wasn't asked to opine on
11    that.
12           Q.   (By Mr. Fletcher)   Okay.   The flow
13    chart reflects that capsules go through an
14    encapsulation process, correct?
15           A.   Yes.
16           Q.   ████████████████████████████████
    ████████████████████████████████████████████████
    ████████████████████████████████████████
19           MS. HASS:   Same objection.   Outside
20    the scope of her report.
21           A.   I wasn't asked to opine on that.
22           Q.   (By Mr. Fletcher)   Okay.   You
23    analyzed this document as part of your report,
24    correct?
25           A.   This document, yes, in general.

Page 69

1                    Q.   As part of your understanding

2          about impediments to launch, correct?

3                    A.   Yes.

4                    Q.   The third column such as it is on

5          slide 63481 refers to pellets, correct?

6                    A.   Yes.

7                    Q.   What is a pellet?

8                    A.   A pellet is typically something

9          that goes into a capsule.

10                   Q.   The fourth column refers to

11         effervescent tablets.  Do you see that?

12                   A.   I do.

13                   Q.   What is an effervescent tablet?

14                   MS. HASS:  Objection.  Outside the

15         scope of her report.

16                   A.   I wasn't asked to opine on that.

17                   Q.   (By Mr. Fletcher)  Have you ever

18         worked on an effervescent tablet before?

19                   A.   I have not, no.

20                   Q.   Do you think Alka-Seltzer is an

21         effervescent tablet?

22                   A.   It is.

23                   MS. HASS:  Objection.

24                   Q.   (By Mr. Fletcher)  So you have

25         some familiarity with effervescent tablets?

Page 70

1                    A.    Some, yes.

2                    Q.    Column five, what is a narrow

3        therapeutic tab?

4                    MS. HASS:    Same objection.    Outside

5        the scope of her report.

6                    A.    I wasn't asked to opine on that.

7                    Q.    (By Mr. Fletcher)    Do you know

8        what that is?

9                    A.    In general.

10                   Q.    What -- in general what does it

11       mean?

12                   MS. HASS:    Same objection.

13                   A.    It's a product that has a vast

14       difference in biologic profile.

15                   Q.    (By Mr. Fletcher)    If we turn to

16       the next slide, we have -- the slide is entitled

17       "Oral Solids Capacities," correct?

18                   A.    Yes.

19                   Q.    And the first column is dosage

20       form; is that right?

21                   A.    It is.

22                   Q.    And the second column is annual

23       capacity, correct?

24                   A.    Yes.

25                   Q.    And as you understand this table,

Page 71

1    the annual capacity column refers back to the

2    corresponding dosage form in the column on the

3    left, correct?

4              A.    I would assume so since it's all

5    within the same section of the slide deck.

6              Q.    ██████████████████████████

██    ████████████████████████████████████

██    █████████████

██        ████        ███████

██        ████    ████████████████████

██    ██████████████████████████████████████

██    ████████████

██        ████        ███████

██        ████    ███████████████████████

██    ███████████████████████████████████

██    █████████████

██        ████    ██████████████████████

██        ████    ███████████████████████

██    ████████████████████████████████████████

██    █████████████

21             MS. HASS:   Objection to form.

22             A.    So that's what is here on the

23   document.  I'm not exactly sure if this is

24   accurate or not, as with the other ones.  All I

25   can do is read what's here on the page.

Page 72

1          Q.    (By Mr. Fletcher)  Okay.  What
2    would you need to know to confirm whether this
3    is an accurate annual capacity?  How would you
4    do that?
5          A.    Typically I would ask the people
6    who run the manufacturing facility what their
7    capacity is as of today.  This document -- I
8    don't know the date on it.  It could have been
9    five years old at the time.
10          Q.    Okay.  As you understand this
11    document, which was the second document listed
12    in your materials relied upon, ██████████

     ████████████████████████████████████████████

     ██████████████████████████, correct?
15          A.    I see that.
16          Q.    And that's the correct way to read
17    this document?
18          A.    I believe so.  I -- I've never
19    worked with INTAS, so I don't know their exact
20    meaning.  But from an outsider perspective, I
21    think that would be something that could be
22    concluded.
23          Q.    So now if we can keep that open,
24    but if we can turn back to your report,
25    paragraph 156.  This is a document that you

Page 73

1    cited in your analysis in paragraph 156,

2    correct?

3              A.    Yes.

4              Q.    And specifically this slide that

5    we were just looking at is what you cited in

6    support of your footnote 176, correct?

7              A.    Yes.

8              Q.    And in your analysis you concluded

9    that ████████████████████████████████████

     ███████████████████████████.  Do you see that?

11             A.    I do see that.

12             Q.    Would it be more fair to say that

13   ████████████████████████████████████████████

     ████████████████████████████?

15             A.    So according to this document

16   here, that's what it says, yes.

17             Q.    Okay.  This document that you've

18   cited does not separately identify the annual

19   capacity at ███████ for making tablets, correct?

20             A.    Correct.

21             Q.    And do you know what ████████████

22   annual capacity was for making tablets?

23             A.    Off the top of my head, no.  I had

24   to rely on this document.

25             Q.    Okay.  And you're not aware of any

Page 74

1        document other than this slide 482 that informs

2        the annual capacity for tablets at ████ ,

3        correct?

4                    A.    This is the document that I

5        referenced.

6                    Q.    So sitting here today -- well, I

7        think we can move on.

8                          In paragraph 155, you describe

9        Accord as one of the fastest growing U.S.

10       generic companies; is that correct?

11                   A.    So here it says, "In early 2015

12       INTAS, Accord's Indian parent company, described

13       itself," excuse me, "as one of the fastest

14       growing Indian pharmaceutical companies."

15                   Q.    And, sorry, I was on the prior

16       sentence.

17                   A.    Yes.   Okay.   It does say Accord

18       was one of the fastest growing U.S. generic

19       companies.

20                   Q.    How does that statement factor

21       into your analysis?

22                   A.    It factors into my analysis

23       because I have worked with similar companies

24       that were trying very hard to grow fast.  I've

25       worked with small, medium, and large companies

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that true and correct copies of the foregoing document were caused to be served on October 7, 2024 on the following counsel in the manner indicated below.

Carmella P. Keener
COOCH AND TAYLOR. P.A.
The Brandywine Building
1000 N. West Street, Suite 1500
P.O. Box 1680
Wilmington, DE 19899-1680
302-984-3816
ckeener@coochtaylor.com

*Local Counsel for Smith Drug Company and the Direct Purchaser Class*

Bruce E. Gerstein
Kimberly Hennings
Jonathan Gerstein
David B. Rochelson
GARWIN GERSTEIN &
FISHER LLP
88 Pine Street, 10th Floor
New York, NY 10005
Tel: (212) 398-0055
bgerstein@garwingerstein.com
khennings@garwingerstein.com
jgerstein@garwingerstein.com
drochelson@garwingerstein.com

*Co-Lead Counsel for the Direct Purchaser Class and Counsel for Smith Drug Company*

David F. Sorensen
Caitlin G. Coslett
Andrew C. Curley
Julia R. McGrath
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
dsorensen@bm.net
ccoslett@bm.net
acurley@bm.net
jmcgrath@bm.net

*Co-Lead Counsel for the Direct Purchaser Class and Counsel for Smith Drug Company*

Susan Segura
David C. Raphael
Erin R. Leger
SMITH SEGURA RAPHAEL & LEGER LLP
221 Ansley Blvd
Alexandria, LA 71303
Tel: (318) 445-4480
ssegura@ssrllp.com
draphael@ssrllp.com
eleger@ssrllp.com

*Additional Counsel for Smith Drug Company and the Proposed Direct Purchaser Class*

Peter Kohn
Joseph Lukens
Kristyn Fields
FARUQI & FARUQI LLP
1617 JFK Blvd, Suite 1550
Philadelphia, PA 19103
Tel: (215) 277-5770
pkohn@faruqilaw.com
jlukens@faruqilaw.com
kfields@faruqilaw.com
FARUQI & FARUQI LLP
685 Third Avenue, Floor 26
New York, NY 10017
(212) 983-9330

Stuart E. Des Roches
Andrew W. Kelly
ODOM & DES ROCHES LLC
650 Poydras Street, Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
stuart@odrlaw.com
akelly@odrlaw.com

Russell Chorush
Christopher M. First
HEIM PAYNE & CHORUSH LLP
1111 Bagby Street, Suite 2100
Houston, TX 77002
Tel: (713) 221-2000
rchorush@hpcllp.com

*Additional Counsel for Smith Drug Company and the Proposed Direct Purchaser Class*

Dianne M. Nast
Joseph N. Roda
Michael D. Ford
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Telephone: (215) 923-9300
Fax: (215) 923-9302
dnast@nastlaw.com
jnroda@nastlaw.com
mford@nastlaw.com

*Counsel for KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. and the Proposed Direct Purchaser Class*

Michael L. Roberts
Karen S. Halbert
Stephanie E. Smith
Sarah E. DeLoach
ROBERTS LAW FIRM US, PC
20 Rahling Circle
Little Rock, AR 72223
Telephone: (501) 821-5575
Fax: (501) 821-4474
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us
stephaniesmith@robertslawfirm.us
sarahdeloach@robertslawfirm.us

*Counsel for KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. and the Proposed Direct Purchaser Class*

Michael J. Barry
Laina M. Herbert
GRANT & EISENHOFER P.A.
123 Justison Street, Suite 601
Wilmington, DE 19801
Phone: 302-622-7000
mbarry@gelaw.com
lherbert@gelaw.com

*Counsel for Plaintiff Law Enforcement Health Benefit and the End-Payor Class
Interim Co-Lead Counsel*

Jayne A, Goldstein
Natalie Finkelman Bennett
MILLER & SHAH, LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
jgoldstein@sfmslaw.com
nfinkelman@sfmslaw.com

*Counsel for Plaintiff Fraternal Order of Police, Miami Lodge 20, Insurance
Trust Fund and the End-Payor Class Interim Co-Lead Counsel*

Robert G. Eisler
Chad B. Holtzman
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
reisler@gelaw.com
choltzman@gelaw.com

Sharon K. Robertson
Donna M. Evans
COHEN MILSTEIN SELLERS
& TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
srobertson@cohenmilstein.com
devans@cohenmilstein.com

*Counsel for the Mayor and City Council of Baltimore and the End-Payor Class Interim Co-Lead Counsel*

J. Clayton Athey
Jason W. Rigby
PRICKETT JONES & ELLIOTT, P.A.
1310 N. King Street
Wilmington, DE 19801
(302) 888-6500
jcathey@prickett.com
jwrigby@prickett.com

*Counsel for Plaintiffs Walgreen Co., The Kroger Co., Albertsons Companies, Inc., H-E-B, L.P., Hy-Vee, Inc., CVS Pharmacy, Inc., Rite Aid Corp. and Rite Aid Hdqtrs.*

Scott E. Perwin
Lauren C. Ravkind
Anna T. Neill
KENNY NACHWALTER P.A.
Four Seasons Tower, Suite 1100
Miami, FL 33131
(305) 373-1000
sperwin@knpa.com
lravkind@knpa.com
aneill@knpa.com

*Counsel for Plaintiffs Walgreen Corp. Co., The Kroger Co., Albertsons Companies, Inc., H-E-B, L.P., and Hy- Vee, Inc.*

Barry L. Refsin
Eric L. Bloom
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200
brefsin@hangley.com
ebloom@hangley.com

*Counsel for Plaintiffs CVS Pharmacy, Inc., Rite Aid Corp. and Rite Aid Hdqtrs. Corp.*

DATED: October 7, 2024          /s/ Daniel M. Silver
                                Daniel M. Silver (#4758)